# United States District Court
# Northern District of Alabama
# Southern Division

Gloria Yelder,  ]
  ]
   Plaintiff,  ]
  ]
vs.  ]  CV-00-N-0458-S
  ]
**United States Department of**  ]
**Defense**,  ]
  ]
   Defendant.  ]

**ENTERED**

FEB 0 5 2002

## Memorandum of Opinion

Before the court is defendant Department of Defense's motion to dismiss, and/or, in the alternative, for summary judgment, filed March 28, 2001.  (Doc. # 23.)  The issues have been briefed by both parties and are now ripe for decision.  Upon due consideration, the motion, treated as one for summary judgment, will be granted.

## I.   Facts[1]

### A.   Introduction

The plaintiff, Gloria Yelder, was an employee of the United States Department of Defense ("DoD"), Defense Security Service ("DSS" or "the agency"), previously known as the Defense Investigative Service ("DIS").  (Yelder Dep. at 346; Jackson Decl. at 1-3.)  DSS was established in 1972 as an independent agency within DoD.  (See 32 C.F.R. 377; Def.'s Ex. 3.)  The purpose of DSS includes the conduct of personnel security investigations

---

[1] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).



(background investigations) for DoD military, civilian, and contractor personnel. (Def.'s Ex. 3; Jackson Decl. at 2.) Yelder was assigned to the agency's Huntsville, Alabama, office with her duty station at Birmingham, Alabama. (Yelder Dep. at 346; Jackson Decl. at 2-3.)

### B.    Pertinent Regulations

The agency and its employees are subject to the requirements of DoD Regulation 5200.2-R (1996), DIS Regulation 25-3-R (1997) (or, prior to its being superceded, DIS Regulation 25-3-R (1990)), and to applicable Executive Orders, such as Executive Orders 12958, 12968, and 10450. (DoD Reg. 5200.02-R; DIS Reg. 25-3-R (1990); DIS Reg. 25-3-R (1997); Packett Decl. at 3.) The agency is an "executive agency" within the meaning of the aforementioned Executive Orders.

DoD Regulation 5200.2-R defines "classified information" as "[o]fficial information or material that requires protection in the interest of national security . . . ." (DoD Reg. 5200.2-R at § 1-303.) It defines "access" as "[t]he ability and opportunity to obtain knowledge of classified information." (*Id.* at § 1-300.) Executive Order 12968 provides:

> No employee shall be deemed to be eligible for access to classified information merely by reason of Federal service or contracting, licensee, certificate holder, or grantee status, or as a matter of right or privilege, or as a result of any particular title, rank, position, or affiliation. . . . Eligibility for access to classified information shall be granted only to employees who are United States citizens for whom an appropriate investigation has been completed and whose personal and professional history affirmatively indicates loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment, as well as freedom from conflicting allegiances and potential for coercion, and willingness and ability to abide by regulations governing the use, handling, and protection of classified information. A determination of eligibility for access to such information is a discretionary security decision based on judgments by appropriately trained adjudicative personnel. Eligibility shall be granted only where facts and circumstances indicate access to classified information is

2

clearly consistent with the national security interests of the United States, and any doubt shall be resolved in favor of the national security. . . . In determining eligibility for access under this order, agencies may investigate and consider any matter that relates to the determination of whether access is clearly consistent with the interests of national security.

(EO 12968 at § 3.1.)

A "security clearance" within DoD and the agency is a determination that a person is eligible under DoD Regulation 5200.2-R (1996) for access to classified information, and, within DoD, the terms "security clearance" and "eligibility for access to classified information" are synonymous. (DoD Reg. 5200.02-R at § 1-319; Packett Decl. at 2.) In order to obtain a security clearance, an employee of the agency is required to  undergo a "personnel security investigation." (EO 12968 at § 3.1(d); DoD Reg. 5200.02-R at § 1-316, Chapter 2, Chapter 3, §§ 4 and 7.) To retain a security clearance, an employee of the agency is required to undergo a "periodic reinvestigation" every five years. (EO 12968 at § 3.1(d); DoD Reg. 5200.02-R at § 1-317, Chapter 2, Chapter 3, §§ 4 and 7, § 8-102(f).) Determinations regarding security clearance eligibility are based on information concerning the employee that is acquired through means of the aforementioned investigations or which is otherwise available to security officials. All available, reliable information about a person, both past and present, is considered. (EO 12968 at §§ 3.2(a), 3.4; EO 10450; DoD Reg. 5200.02-R at App. I.)

The process of determining eligibility for a security clearance is called the "adjudicative process." (DoD Reg. 5200.2-R at App. I.) The adjudicative process is an examination of a sufficient period of an agency employee's life to allow an affirmative determination that the employee is an acceptable risk to national security. (*Id.*) The case

3

of each candidate for eligibility is judged on its own merits, with any doubt being resolved in favor of national security. (*Id.*)

Yelder was a special agent with the agency. (Yelder Dep. at 178-80.) As such, Yelder conducted personnel security investigations. (Yelder Dep. at 179-80.) At all times relevant to this action, all agency employees, including Yelder, were required to be eligible for a security clearance and access to classified information at, at least, the "Secret" level. (DIS Reg. 25-3-R (1997) at § 3(i); DIS Reg. 25-3-R (1990) at § 3(g); Def.'s Ex. 8 at 2; Def.'s Ex. 10 at 1; Packett Decl. at 2.) Pursuant to her employment with the agency, Yelder maintained her eligibility for a security clearance at the "Top Secret" level from September 20, 1982, until January 20, 1998. (Def.'s Ex. 8 at 2.)

The adjudication and granting, denial, suspension and revocation of agency clearances is done by the Washington Headquarters Service ("WHS"), Consolidated Adjudication Facility ("CAF"). (32 C.F.R. Pt. 364, App. A at § 6(d); Packett Dep. at 7, 20; DIS Reg. 25-3-R (1997) at § 3(c); Edenfield Decl. at 2.) Procedures for the appeal of adjudicative decisions regarding an agency employee's access or continued access to classified information are set forth in Executive Order 12968 and DoD Regulation 5200.2-R (1996), as well as DIS Regulation 25-3-R (1997). (DoD Reg. 5200.2-R at Chapter 8; DIS Reg. 25-3-R (1997) at ¶ 8(d); EO 12968 at Pt. 5.)

### C.   Investigation of Yelder

Agency officials in the Huntsville, Alabama, office received a complaint from a private citizen, Andrea Whitfield, on December 10, 1995, that Yelder was "harassing her via

telephone and correspondence."[2] (Griffis Dep. at 15-17, Ex. 2.) The officials were required to report Whitfield's allegations to higher level agency officials.[3] (Jackson Decl. at 3, Att. 1 at tab 4; DIS Regulation 11-752.1; Bowling Dep. at 36-37.) In accordance with agency policy and practice, the agency's Office of Inspector General conducted an investigation of the allegations.[4] (Jackson Decl. at 3, Atts.1, 2, 3.) The investigation was designated "C95-098," with one component part, a September 26, 1996, Report of Yelder's September 24, 1996, Polygraph Examination bearing the separate case control number ("CCN") "89234-DXX-1819-1E3." (*Id.* at 4, Atts. 1, 2, 3.)

Phillip Bowling served as the Special Agent in Charge ("SAC") of the agency's Huntsville, Alabama, office from June, 1993, until March, 1997. (Bowling Dep. at 5-6, 36.)

---

[2]For the sake of brevity, and because of minimal relevance, the court will not endeavor to relate the details of Whitfield's complaint. It is enough to note that Whitfield, who was married at the time, accused Yelder of harassing her with threatening phone calls and letters because Yelder thought that Whitfield was seeing her boyfriend. (Griffis Dep. at Ex. 2.)

[3]The evidence submitted by the parties also reveals the existence of an e-mail, dated December 13, 1995, and bearing a subject line: "Request for Information (OIG#C95-098)." It states:

> Mr. John S. Benson has requested an inquiry into a citizen's complaint that she was being harassed by S/A Gloria D. Yelder, D41HV w/ duty station at [sic] Birmingham, AL. Apparently there is/was a relationship between Yelder and complainant's spouse. If you have any pertinent info pls advise. Thanks.

(Pla.'s Add. Evi., Ex. 3.) As discussed in the following section, one of Yelder's contentions is that a separate investigation about an alleged affair in which she was engaged was conducted secretly. According to Yelder, the e-mail indicates that a second complaint was made about her (one other than the complaint made by Whitfield) because the complaint made by Whitfield did not concern a relationship between Yelder and a married man, but, rather, a relationship between Whitfield (a married woman) and Yelder's unmarried boyfriend. DoD argues that the e-mail does not prove the existence of a second, secret complaint against Yelder that she was having an affair with a married man. Instead, it argues that no investigation was ever conducted concerning the alleged affair that Yelder maintains is charged by the e-mail.

[4]There is a dispute between the parties over whether this investigation was an "administrative inquiry" or an "Inspector General's investigation," and whether there is even a difference between the two. The dispute is enmeshed in the dispute between the parties over whether a secret investigation was performed by the agency in addition to the one discussed above, which is addressed more thoroughly in the following section.

Yelder received a letter of reprimand from Bowling, on July 8, 1996, for the conduct alleged by Whitfield. (Bowling Dep. at 17, 37-38, 41; Bowling Decl. at 1-2, Att. 1.) Yelder grieved Bowling's Letter of Reprimand to a higher level agency official, Renee Davis Harding, then-Deputy Director for Investigations. (Violette Decl. at 2, Att. 2.) Yelder's grievance of Bowling's Letter of Reprimand was denied. (Id. at 2, Att. 3.)

The agency is obliged to advise the WHS CAF of information of adjudicative significance under DoD Regulation 5200.2-R regarding an employee's conduct. (Packett Dep. at 6-7; DoD Reg. 5200.02-R at § 8-101.) In accordance with agency practice and DoD policy and regulation, in 1996, each report related to the investigation conducted by the agency's Office of Inspector General was forwarded to the WHS CAF by the agency Office of Security. (Packett Decl. at 4, Atts. 1, 2, 3.) The WHS CAF received the agency's initial report in its investigation C95-098, dated April 9, 1996, and having a cover letter of April 17, 1996. (Edenfield Decl., Att. 30.) The WHS CAF received the agency's supplemental report to its investigation C95-098 (regarding an additional complaint made by Whitfield after the transmission of the initial report), dated August 30, 1996, and having a cover letter of September 10, 1996. (Id., Att. 32.) The WHS CAF also received the agency's September 26, 1996, report of Plaintiff's September 24, 1996, polygraph bearing case control number ("CCN") 89234-DXX-1819-1E3. (Edenfield Decl., Att. 31.)

A Periodic Reinvestigation is generally conducted on all DoD employees every five years. (Yelder Aff. at 9.) Prior to 1996, Yelder's most recent Periodic Reinvestigation, CCN 89234-DXX-1819-1E3, had been conducted in 1989. (Packett Dep. at 27-28; Blake Decl. at 2, Att. 1.) In accordance with agency practice and DoD policy and regulations, subsequent

to receipt of the initial (April 9, 1996) report prepared in the agency's investigation C95-098, the agency initiated a Periodic Reinvestigation in 1996. (Packett Dep. at 27-28.) Yelder's 1996 Periodic Reinvestigation includes a two page "DD Form 1879 DoD Request for Personnel Security Investigation," showing at its first page the date completed to be October 3, 1996; a one page "PIC Form 13," dated October 3, 1996; a six page Report of Investigation made by Special Agent Martin Dexter Jones, with eighteen pages of attachments, dated August 23, 1996; a one page Report of Investigation made by Special Agent Steve S. Rhodes, dated September 20, 1996; a one page "Report of NAC/ENTNAC," dated July 23, 1996; a one page "Report of Credit," dated July 15, 1996; a nine page Questionnaire for National Security Positions, dated May 22, 1996; and is covered by a one page Department of Defense, Defense Investigative Service, "DIS Form 3 Retention Control Sheet," dated October 3, 1996. (Blake Decl. at 2-3, Att. 2.)

Pages 1, 2, 4, and 30-31 of the Periodic Reinvestigation bear the CCN "96192-DXC-1817-1E3." (*Id.*) Pages 6-10 bear the CCN "96192-DXC-1817." (*Id.*) Page 5 bears the CCN "96192-DXC-1817-1b3." (*Id.*) Page 29 bears the CCN "96192-DX0-1817-1E3." (*Id.*) The number "96192," which appears at the beginning of the CCN and does not change throughout the Periodic Reinvestigation, refers to the "Julian date" on which Yelder's investigation was opened at the agency's Personnel Investigations Center ("PIC"): the 192nd day of the year 1996. (Yelder Dep. at 137-38; Packett Dep. at 52; Griffis Dep. at 9; Bowling Dep. at 24-25, 40.) The number "1817," which appears as the third set of characters and, again, does not change throughout the Periodic Reinvestigation, refers either to the 1817th case opened on the 192nd day of the year, or to the 1817th case opened during the

year.[5]  (Bowling Dep. at 25, 40; Blake Decl. at 4; Yelder Aff. at 21.)  The other sets of

characters in the case control number (those that tend to vary on different pages of the

periodic reinvestigation) refer to the control team and the case category.[6]  (Blake Decl. at

4-5.)

### D.      The Request to Undergo a Psychiatric Evaluation

By memorandum dated November 22, 1996, the WHS CAF requested that Yelder

undergo a voluntary medical/psychiatric evaluation based on information provided to it by

the agency concerning the alleged harassing letters and telephone calls to Ms. Whitfield.

(Edenfield Decl., Att. 1.)  In response, Yelder neither consented to nor refused to consent

to the evaluation, but instead advised the WHS CAF that she felt her medical doctor could

answer any questions regarding her mental and emotional stability.  (*Id.*, Att. 3.)  By

memorandum dated January 27, 1997, the WHS CAF advised Yelder that a credentialed

mental health professional, such as a licensed clinical psychologist, a licensed clinical

social worker, or a board certified psychiatrist must conduct the requested evaluation in

accordance with Appendix I of DoD Regulation 5200.2-R (1996).  (*Id.*, Att. 4.)

---

[5]There appears to be an irrelevant dispute between the parties as to the meaning of this number.
Regardless of the dispute, the fact remains that it is a constant and refers to a single case.

[6]As discussed in the following section, Yelder argues that the fact that the case control number listed on
the various pages differ is evidence that there was more than one periodic reinvestigation performed concerning
her, in violation of agency rules and regulations.  However, as noted, the case control number throughout the
periodic reinvestigation has two sets of characters that remain constant, and it is those characters that demonstrate
that there was a single periodic reinvestigation performed in this case, notwithstanding Yelder's assertions that
she has never known a case control number to vary in the same investigation.  As the DoD noted in its statement
of facts, "Although certain characters in the CCN for Plaintiff's 1996 Periodic Reinvestigation completed October
3, 1996 changed, all CCN's used in the investigation refer to the 1817th case opened on the 192nd day of the year
1996, which is a designation unique to Plaintiff's investigation."  (Def.'s Stmt. of Facts at # 79.  *See* Bowling Dep.
at 40; Blake Decl. at 4-5.)

On March 5, 1997, the WHS CAF received a statement from Yelder in which she advised, "I will take a medical examination, but it will not be for harassing Whitfield because I did not." (*Id.*, Att. 5.) By memorandum dated March 14, 1997, the WHS CAF advised her that she would be contacted by an agency Resource Directorate employee to schedule the evaluation. (*Id.*, Att. 6.) On March 25, 1997, Yelder acknowledged her receipt of the WHS CAF's memorandum and notified it that she would consent to the psychiatric/medical evaluation, stating, however, that "[s]ince I may not have a job in the next few months, for my own protection, I want my attorney and my own medical personnel present when I take this evaluation. The medical personnel will be paid by me." (*Id.*, Att. 7.)

By memorandum dated April 10, 1997, the WHS CAF advised Yelder that having her attorney and medical personnel present during the conduct of the medical evaluation would hinder the evaluation process and affect the quality of the evaluation. (*Id.*, Att. 8.) The WHS CAF then gave her three options for undergoing the medical/psychiatric evaluation: (1)she could undergo the evaluation as arranged by the agency Office of Security using a government provided mental health professional; (2) she could undergo the evaluation utilizing a licensed clinical psychologist, a licensed social worker, or a board certified psychiatrist of her own choosing and at her own expense, allowing (a) the WHS CAF to provide directly to the selected evaluator the results of her background (personnel security) investigation and specific evaluation criteria necessary to facilitate a fair and informed adjudicative determination, (b) the evaluator to reply directly to the WHS CAF with the evaluation results, and (c) the evaluation to be conducted in accordance with the criteria

at Appendix I of DoD Regulation 5200.2-R; or (3) she could undergo the medical/psychiatric evaluation utilizing either a licensed clinical psychologist, a licensed social worker, or a board certified psychiatrist of her own choosing and at her own expense. (*Id.*) With regard to the third option, the WHS CAF stated, "[t]his option may not apply the specific evaluation criteria necessary for this office to make a fair and informed adjudicative determination." (*Id.*)

On May 14, 1997, Yelder selected the second option, advising the WHS CAF that she would use Fletcher Hamilton, a licensed psychologist, to conduct the requested evaluation. (*Id.*) By letter dated May 21, 1997, Hamilton requested that the WHS CAF send to him all pertinent information. (*Id.*, Att. 9.) By memorandum dated June 9, 1997, the WHS CAF forwarded to Hamilton the requested materials. (*Id.*, Att. 10.) On August 20, 1997, the WHS CAF contacted Hamilton's office to determine the status of the medical/psychiatric evaluation. (*Id.*, Att. 11.) On August 21, 1997, it was advised by Hamilton's office that if it wanted Yelder's investigative file returned to it, it would first have to pay a $25.00 administrative handling fee, and that it would have to go through Yelder in order to obtain the results of the evaluation. (*Id.*)

By memorandum dated August 25, 1997, the WHS CAF advised Yelder to notify it within five days of her receipt of the memorandum that she had arranged to have Hamilton provide the results of her medical/psychiatric evaluation to the WHS CAF. (*Id.*, Att. 12.) By letter dated August 26, 1997, Yelder's attorney, John F. Kizer, advised the WHS CAF that she "does not have the time nor the money for Dr. Hamilton to perform the evaluation," that he did not "think she should be required to spend a thousand dollars of her own money for the

10

evaluation," that she "is still willing to submit" to the requested evaluation, that "[a]s I understand it, the evaluation will be arranged by the [agency]," and asked that the WHS CAF "kindly inform the undersigned as to the qualifications of the person selected to perform the evaluation." (*Id.*, Att. 13.)

By letter dated September 8, 1997, the WHS CAF replied to Yelder's attorney, acknowledged her continued willingness to submit to the requested evaluation, noted that since November 1996, she had several opportunities to submit to the requested evaluation and had been made aware of the consequences of failing to submit to the requested evaluation, and concluded that, "[i]n light of her failure to satisfy this request, despite efforts to accommodate her in this matter, an adjudicative determination will be made based on the information at hand." (*Id.*, Att. 14.) The WHS CAF did not provide a medical expert for the evaluation because of her behavior over the prior ten months, despite her representation that she was willing to cooperate. (Edenfield Dep. at 61.)

### E.    Revocation of Yelder's Security Clearance

By memorandum dated October 15, 1997, the WHS CAF provided Yelder with a Statement of Reasons as to why her security clearance should be revoked. (Edenfield Decl., Att. 15.)  In determining to revoke her security clearance, the WHS CAF noted Yelder's "failure to cooperate with the required security processing, after indicating that [she was] willing to cooperate if certain accommodations were made," as having lessened her credibility with the WHS CAF and having resulted in that office not "having sufficient information on which to base a favorable determination" regarding her security clearance.

11

(*Id.*, Att. 15 at 5.)  As the basis for the revocation of her security clearance, the WHS CAF stated that

> [Yelder's] conduct, to include [her] uncooperativeness regarding the medical/psychiatric evaluation, is indicative of an emotional, mental, or personality disorder which could result in a deficit in [her] psychological, social, or occupational functioning and involves questionable judgment, untrustworthiness, unreliability, or unwillingness to comply with rules and regulations which indicates that [she] may not properly safeguard classified information.  Therefore, [her] personal conduct is of security concern.

(*Id.*, Att. 15 at 6.)  On November 4, 1997, Yelder acknowledged her receipt of the WHS CAF Statement of Reasons, and, on November 17, 1997, she responded to them. (*Id.*, Atts. 16, 17.)

By a memorandum Letter of Revocation dated January 20, 1998, the WHS CAF revoked Yelder's security clearance. (*Id.*, Att. 18.)  The WHS CAF, in its Letter of Revocation, cited her personal conduct, as described in the October 15, 1997, WHS CAF Statement of Reasons, as the basis for the revocation of her security clearance.  (*Id.*)  With the memorandum Letter of Revocation revoking her security clearance, she was provided with a "Letter of Revocation Receipt and Notice of Intent to Appeal" and "Instructions for Appealing a Letter of Revocation."  (*Id.*)  Governing rules and regulations permit an agency employee to make a personal appearance before an Administrative Judge from the Defense Office of Hearings and Appeals ("DOHA") as part of the process of appealing a decision by the WHS CAF to revoke an agency employee's security clearance.  (DoD Reg. 5200.2-R at §8-201(d).)  Yelder acknowledged her receipt of the Letter of Revocation and requested the opportunity to make "[a] personal appearance before a Defense Office of Hearings and Appeals (DOHA) Administrative Judge."  (Edenfield Decl., Att. 19 at 1.)  By memorandum

dated February 2, 1998, her access to classified information and assignment to sensitive duties were suspended pending the outcome of her appeal. (Packett Decl. at Att. 4.)

By letter dated March 6, 1998, Yelder's attorney requested a copy of her "complete file." (*Id.*, Att. 21.) By letter dated March 19, 1998, the WHS CAF advised him that the file requested had been provided to Plaintiff with her Statement of Reasons.[7] (*Id.*, Att. 22.) DOHA scheduled a personal appearance for Yelder on April 8, 1998, and provided her with guidance for her personal appearance. (*Id.*, at Att. 23.) WHS CAF provided its case file concerning Yelder to the Administrative Judge, which included the administrative inquiry report of April 9, 1996, the supplemental report of August 30, 1996, the periodic reinvestigation, and correspondence from Yelder to DSS.[8] (Edenfield Dep. at 36-37.)

Yelder appeared personally before DOHA Administrative Judge Kathryn M. Braeman on April 8, 1998. (Edenfield Decl., Atts. 24, 25.) During her appearance before Judge Braeman, she was represented by her attorney, was permitted to submit documents into evidence, and was allowed to provide oral testimony regarding the grounds for the revocation of her clearance. (*Id.*) Judge Braeman held the record open for two weeks, permitting Yelder to obtain a psychological evaluation at her own expense for inclusion in the record. (*Id.*, Att. 24 at 97-99.) Yelder submitted a report of a psychological evaluation into the record of the DOHA proceedings. (*Id.*, Att. 25 at Ex. 33.)

---

[7]There is, however, substantial evidence that Yelder did not receive all of the information that WHS CAF had in its possession regarding the earlier investigations, in arguable violation of § 8-201 (a) of DoD Reg. 5200.2-R. However, as discussed below, Yelder has failed to show how she was prejudiced by this possible violation of regulations.

[8]The Administrative Judge noted that WHS CAF failed to submit the administrative correspondence regarding the psychiatric examination requested by WHS CAF. (Pla.'s Ex. 1 at 3 n.1.) However, the judge also pointed out that Yelder provided her with much of the correspondence. (*Id.*)

In an opinion dated May 14, 1998, Judge Braeman recommended that Yelder maintain her security clearance. (Pla.'s Ex. 1 at 1, 16.)  Not only did she note that the decision to not furnish a medical examiner to examine Yelder was "inexplicable," she pointed out the favorable evaluation of the examination that Yelder had obtained on her own. (*Id.* at 1, 11-12.)  The decision of a DOHA Administrative Judge, however, is a recommendation only, advisory in nature, and is not binding on the WHS Clearance Appeals Board ("CAB"), with whom the final decision regarding whether to sustain or overturn the decision of the WHS CAF rests. (*Id.*, Att. 24 at 98, Att. 26; DoD Reg. 5200.2-R at § 8-201(d)(2)-(e), App. N at § 5(e) and 6.) (DoD Reg. 5200.2-R at §§ 8-103, App. F at § F, App. M at § 8, App. N at § 6.)  On June 24, 1998, after considering the record of the WHS CAF and of Yelder's personal appearance, as well as the recommended decision of Judge Braeman, the WHS CAB upheld the revocation of her security clearance. (Edenfield Decl., Atts. 28, 29.)  She was notified of the decision of the WHS CAB by letter dated June 26, 1998. (*Id.*, Att 29.)

As a result of the revocation of her security clearance, the agency proposed to remove Yelder from the federal service. (Def.'s Ex. 8.)  She was given the opportunity to reply to her proposed removal, which she did. (*Id.*; Def.'s Ex. 9.)  After her reply was considered, she was removed from the federal service because there were no nonsensitive positions within DSS to which she could have been reassigned. (Def.'s Ex. 10.)  On February 24, 2000, Yelder filed the present action. (Compl.)

14

## III.    Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (*quoting* Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23.  Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (*quoting* Fed. R. Civ. P. 56(e)).

After the plaintiff has properly responded to a motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P 56(c).  The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a

15

reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

**IV.    Discussion**

Originally, Yelder asserted two claims: violation of Title VII and violation of her procedural due process rights as guaranteed by the Fifth Amendment to the United States Constitution. She has abandoned the former, leaving only the latter. Although her complaint is far from clear, it appears that Yelder asserts two separate bases for her due process claim. First, she seems to argue that DoD violated her due process rights generally, regardless of whether it followed its regulations in revoking her security clearance and terminating her employment. She also appears to argue that during the revocation process, DoD violated its own regulations, which, she argues, is a violation of her right to due process. Each ground is addressed separately.

16

**A.      Procedural Due Process without Regard to DoD Regulations**

Any claim by Yelder that, apart from alleged violations of its regulations, DoD violated

her procedural due process rights fails as a matter of law.  In *Department of Navy v. Egan*,

the Supreme Court stated:

> It should be obvious that no one has a "right" to a security clearance.  The
> grant of a clearance requires an affirmative act of discretion on the part of the
> granting official.  The general standard is that a clearance may be granted
> only when "clearly consistent with the interests of the national security."  *See,*
> *e.g.,* Exec. Order No. 10450, §§ 2 and 7, 3 CFR 936, 938 (1949-1953 Comp.);
> 10 CFR § 710.10(a) (1987) (Department of Energy); 32 CFR § 156.3(a) (1987)
> (Department of Defense).  A clearance does not equate with passing
> judgment upon an individual's character.

*Department of Navy v. Egan*, 484 U.S. 518, 528 (1988).  Virtually every court that has faced

a procedural due process claim in the revocation of a security clearance since *Egan*,

relying on this statement, has held that since there is no right to a security clearance, no

process is due when the executive decides to revoke that clearance.  *See Hesse v. Dep't*

*of State*, 217 F.3d 1372, 1381 (Fed. Cir. 2000); *Dorfmont v. Brown*, 913 F.2d 1399, 1403-04 (9th

Cir. 1990); *Jamil v. Secretary, Dep't of Defense*, 910 F.2d 1203, 1909 (4th Cir. 1990); *Hill v.*

*Dep't of Air Force*, 844 F.2d 1407, 1411-12 (10th Cir. 1988); *Chesna v. United States Dep't*

*of Defense*, 850 F. Supp. 110, 118-19 (D. Conn. 1994).  On the authority of the foregoing

cases, the court finds that summary judgment is due to be granted in favor of DoD to the

extent that Yelder asserts a procedural due process claim not related to alleged violations

by DoD of its own regulations.

## B.    *Accardi* Claims

While the court holds that a due process attack not centered upon regulation violations will not lie, the case law is clear that the court can entertain a claim that an agency or department failed to follow its own regulations. *See, e.g., Hill*, 844 F.2d at 1412. Such a claim is based on the Supreme Court opinion in *United States ex rel. Accardi v. Shaughnessy*,[9] wherein the Court held that regulations established by an agency are binding both upon the citizen and the agency. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266-67 (1954).[10] Although Yelder's submissions are far from clear,[11] it appears that she asserts five separate ways in which DoD failed to follow its regulations during the process of revoking her security clearance and terminating her employment, each of which is discussed separately.

---

[9] Claims that an agency failed to follow its own regulations are, thus, known as *Accardi* claims.

[10] In *Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32 (D.D.C. 1998), the District Court for the District of Columbia explained in great detail the history and basis of *Accardi* claims. While the court does not intend to delve into the intricacies of claims brought pursuant to *Accardi*, the court does note that there is some confusion over the proper basis upon which to bring such a claim, courts having heard them on the basis of, *inter alia*, procedural due process, the Administrative Procedures Act, and substantive due process. *See generally Wilkinson*, 27 F. Supp. 2d at 48-60 ("Identifying the legal source for the Supreme Court's pronouncement that government agencies are bound to follow their own rules is no simple matter.").

[11] Yelder's submission is plagued by a number of conclusory allegations that DoD failed to follow its regulations without an actual citation to the regulation allegedly violated. This court is not charged with the task of reading every regulation pertaining to DoD and applying those regulations to the facts of this case in order to isolate every possible violation committed by DoD. *Cf. U.S. v. Giovannetti*, 919 F.2d 1223, 1230 (7th Cir. 1990) (Posner, J.) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is a good point despite a lack of supporting authority or in the face of contrary authority, forfeits the point. . . . We will not do his research for him.") The court, therefore, will address only those alleged violations to which a citation to a regulation is appended, or for which the court was able to uncover an applicable regulation as it researched the law.

18

### 1. The Initial Investigation

Yelder asserts that DoD conducted a secret investigation of her in regard to an e-mail that was apparently sent on December 13, 1995, three days after Andrea Whitfield first alleged that Yelder was harassing her. She argues that the fact that she was never told of this investigation violated DoD regulations because she was never given the opportunity to address and rebut the supposed allegation that she was having an affair with a married man. The e-mail that allegedly forms the basis of this secret investigation bears a subject line of: "Request for Information (OIG#C95-098)," and states:

> Mr. John S. Benson has requested an inquiry into a citizen's complaint that she was being harassed by S/A Gloria D. Yelder, D41HV w/ duty stationat [sic] Birmingham, AL. Apparently there is/was a relationship between Yelder and complainant's spouse. If you have any pertinent info pls advise. Thanks.

(Pla.'s Add. Evi., Ex. 3.) The only other evidence cited by Yelder that a separate investigation that she was not told about was conducted is that the case number referenced on the e-mail is the same as the case number of the administrative inquiry that was closed in August, 1996, and that Administrative Judge Braeman's opinion references two separate investigations conducted by DoD.

The evidence cited by Yelder simply does not support her allegation of a secret investigation. First, the e-mail that she cites does not demonstrate that, in fact, a separate investigation was initiated by DoD. Indeed, the e-mail is ambiguous at best and does not create a genuine issue as to whether any action was ever taken in regard to an affair. Second, the fact that the case number referenced in the subject line of the e-mail was identical to the case number of the investigation that was closed in August, 1996, indicates

that, in fact, only one investigation was ever conducted.  Finally, although Judge Braemen's opinion does reference two separate investigations, a close reading of the opinion indicates that her reference is to the investigation that was closed in August, 1996, and the Periodic Reinvestigation that was conducted during the late summer and fall of 1996.  Yelder was well aware of both of these investigations.

### 2.    The Periodic Reinvestigation

The next allegation of failure to follow regulations centers around the Periodic Reinvestigation.  Yelder argues that DoD violated its regulations by conducting two Periodic Reinvestigations on her within months of each other.  Indeed, DoD does not dispute that a Periodic Reinvestigation should only occur once every five years on a particular employee.  However, the only evidence submitted by Yelder that there was more than one Periodic Reinvestigation is that within the final packet of information related to the reinvestigation, different case control numbers appear on different pages.  As discussed *supra*, however, the different numbers that appear do not indicate separate reinvestigations, Yelder's declarations to the contrary notwithstanding.  Within all of the various case control numbers that appear in the packet are characters that indicate that they relate to the same reinvestigation: the 1,817th case opened on the 192nd day of 1996.[12]  The fact that other characters (those regarding the type of investigation and the case controller) vary is of no

---

[12]Alternatively, the characters could indicate that they relate to the 1817th case opened in 1996, which occurred on the 192nd day of that year.  Whichever interpretation is correct is of no consequence because the fact remains that the characters common to all of the case control numbers present in the final packet indicate the opening of a single case of which all of the documents are a part.

consequence in light of the similarities in the case control numbers that indicate that all of the pages of the final packet relate to the same case.

Yelder also argues that, regardless of whether more than one reinvestigation occurred, DoD breached its regulations by failing to take a statement from her in regard to her alleged harassment of Whitfield and the affair that, she alleges, was investigated.[13]  A handbook apparently utilized by DSS in performing periodic reinvestigations, DSS-20-1-H, states at §2-45 that "[w]ritten statements will be requested from Subject [of investigation] . . . whenever Subject's testimony differs materially from the facts of the case."  Yelder argues that because she denies that she harassed Whitfield, her testimony differed from the facts of the case and a written statement should have been taken from her.[14]  Her argument is without merit.  She does not point out what "facts of the case" are established by the periodic reinvestigation, rendering it impossible for this court to determine whether her denials differ from those facts.  At any rate, the reinvestigation does not take a position regarding whether Yelder actually engaged in the alleged conduct; rather, the reinvestigation states facts that neither side disputes, such as the fact that Yelder was reprimanded and subsequently grieved the reprimand.  Therefore, the court finds that there is no evidence that Yelder's denials are different from the facts of the case established by

---

[13] Though, as stated above, there is no sufficiently probative evidence that an affair was ever investigated by DoD.

[14] The court reaches the merits of Yelder's contention even though she has failed to demonstrate that the handbook provision at issue should be regarded as a binding regulation, the violation of which supports an *Accardi* claim.

21

the reinvestigation, and that she has therefore failed to put forward sufficient evidence that

DoD violated its handbook, identified as DSS-20-1-H.

### 3.   Alleged Violations of DoD Regulation 5200.2-R

The third allegation leveled against DoD in regard to its procedures is based on

certain provisions in Chapter 8 of DoD Regulation 5200.2-R.  The pertinent provisions of that

chapter read:

> 8-201   Unfavorable Administrative Action Procedures
> Except as provided for below, no unfavorable administrative action
> shall be taken under the authority of this Regulation unless the individual
> concerned has been:
>
> a.   Provided a written statement of the reasons (SOR) as to why the
> unfavorable administrative action is being taken . . . . In addition, the CAF will
> provide within 30 calendar days, upon request of the individual, copies of
> releasable records of the personnel security investigation . . . .
>
> b.   Afforded an opportunity to reply in writing to the CAF within 30
> calendar days from the date of receipt of the SOR. . . .
>
> c.   Provided a written response by the CAF to any submission
> under subparagraph b. stating the final reason(s) for the unfavorable
> administrative action . . . . Such response shall be as prompt as individual
> circumstances permit, not to exceed 60 calendar days from the date of
> receipt of the response submitted under subparagraph b., above . . . .
>
> d.   Afforded an opportunity to appeal an LOD, issued pursuant to
> paragraph c. above, to the component Personnel Security Appeals Board
> (PSAB).  The PSAB shall consist of a minimum of three member and function
> in accordance with Appendix M.

DOD Reg. 5200.2-R (1996).  Yelder claims that her appeal was not placed in front of a three

member appeals board, that she was not provided with certain information in spite of the

fact that she requested it, and that the WHS CAF did not respond within thirty days to her

reply to the Statement of Reasons it had provided in justification of its decision to terminate

22

her security clearance.  It should be noted from the outset, however, that Yelder has failed

to demonstrate that Chapter 8 of DoD Regulation 5200.2-R creates an affirmative duty on the

part of the agency, the violation of which subjects DoD to an *Accardi* claim.  Indeed, the

initial provision of Chapter 8 states:

> For purposes of this Regulation, an unfavorable administrative action includes
> any adverse action which is taken as a result of a personnel security
> determination . . . .  This chapter is intended only to provide guidance for the
> internal operation of the Department of Defense and is not intended to, does
> not, and may not be relied upon, to create or enlarge the jurisdiction or
> review authority of any court . . . .

DoD Reg. 5200.2-R at § 8-100.  Nevertheless, the court will address Yelder's contentions

head-on.

### a.    The Appeals Board

Yelder argues that DoD violated § 8-201(d) by failing to place her appeal in front of

a three-member appeals board.  She argues specifically that the letter she received from

the Clearance Appeals Board ("CAB"), with whom her final appeal rested, does not indicate

that all three members of the board actually reviewed her appeal.  As to her allegation that

her appeal was not placed before an appeals board, it is undisputed that her appeal was

placed before the CAB.  DoD argues that CAB is an appeals board, a fact which Yelder has

failed to dispute with any substantial evidence.  Indeed, her argument as to this point is

itself insubstantial.

As to her separate claim that only one of three member of the CAB actually reviewed

her appeal, the letter she received from the CAB states in pertinent part:

> The Clearance Appeals Board has met and carefully reviewed the transcript
> of your personal appearance, the documents you provided during and

23

following your appearance, and the recommendation of the administrative judge who conducted the appearance. We also reviewed all related case documents and any and all information reflecting favorably on your case. The Board was impressed by your years of service as a civilian employee of the Department of Defense and by your successful career as a Special Agent of the Defense Security Service. However, thorough consideration of your appeal reveals no information that significantly mitigates or refutes the personal conduct issue that was the basis of the revocation of your security clearance eligibility.

Edenfield Decl., Ex. 29. Apparently, the fact that only the president of the CAB signed the

letter indicates to Yelder that he was the only member of the CAB to have reviewed the

relevant documents and made a determination as to her appeal. Not only is the failure of

the other CAB members to sign the letter insufficient evidence that they did not review her

appeal, the letter itself reveals just the opposite. Yelder's claim to the contrary, then, is

meritless.

### b.   Provision of Records

Yelder next contends that DoD violated § 8-201(a) because it failed to supply her with

certain records in her personnel file that her attorney requested. Indeed, it appears from

the parties' submissions that there is a question of fact as to whether DoD provided all of

the records regarding Yelder's personnel security investigation. Specifically, Yelder may

not have been provided with records concerning: (1) the supplemental administrative

inquiry that was closed in August, 1996, and (2) the report of the polygraph examination that

she took in September, 1996.[18]

---

[18] Yelder also argues that she was not provided with any documentation related to DoD's determination that it would not provide her with a professional to perform its requested psychiatric examination because it felt that, based on her previous ten months of noncompliance with the request, she would not utilize this option. However, there is no evidence that any such documentation exists. To the extent that she was not provided with copies of the letters that DoD sent to her in regard to the psychiatric examination, or, more appropriately, the lack thereof, she presumably had already received these letters when they were initially sent to her, rendering the

Case law makes clear that a plaintiff is not entitled to relief pursuant to an *Accardi* claim if he or she is unable to demonstrate that the failure of the agency to follow its own regulations prejudiced the plaintiff in some way. As has been recently stated:

> Courts are not to require agencies to cross every "t" and dot every "i" without regard to the costs, difficulties, and proportionality of ordering such remedies. Rather, the *Accardi* doctrine establishes that the rule of law is to be reasonably enforced. [*U.S. v.*] *Caceres* [, 440 U.S. 741 (1979),] and *American Farm Lines* [*v. Black Ball Freight Serv.*, 397 U.S. 532 (1970),] stand for the proposition that when a procedural violation is deemed immaterial or harmless, a court will not require an agency to engage in the empty exercise of repeating a procedure according to rules where the result of the procedure is foreordained.

*Wilkinson v. Legal Services Corp.*, 27 F. Supp. 2d 32, 63 (D.D.C. 1998). *See also Carnation Co. v. Secretary of Labor*, 641 F.2d 801, 804 n.4 (9th Cir. 1981); *Stafford v. Pratt*, 2001 WL 548898, *1 (N.D. Tex. 2001); *Vanover v. Hantman*, 77 F. Supp. 2d 91 (D.D.C. 1999). *Cf. Waldron v. I.N.S.*, 17 F.3d 511, 518-19 (2nd Cir. 1994); *Von Kahl v. Brennan*, 855 F. Supp. 1413, 1421-23 (M.D. Pa. 1994).

As both parties have noted, the only relief available to a plaintiff who successfully brings an *Accardi* claim is a remand to the agency for the proper application of its regulations. *See Hill*, 844 F.2d at 1412. In light of the available relief, then, it is eminently reasonable to require that the plaintiff demonstrate that she was prejudiced in some way in order to be entitled to a rehearing by the agency on the issue. Indeed, binding precedent in the Eleventh Circuit mandates such a requirement. In *Alamo Express, Inc. v. United States*, the former Fifth Circuit stated:

---

failure to provide her with said correspondence a second time entirely nonprejudicial.

When an administrative agency promulgates rules to govern its proceedings, these rules must be scrupulously observed. (Citation omitted). This is so even when the defined procedures are ". . . generous beyond the requirements that bind such agency . . . ." (Citation omitted). For once an agency exercises its discretion and creates the procedural rules under which it desires to have its actions judged, it denies itself the right to violate these rules. (Citation omitted). If an agency in its proceedings violates its rules **and prejudice results**, any action taken as a result of the proceedings cannot stand. (Citation omitted).

*Alamo Exp., Inc. v. U.S.*, 613 F.2d 96, 98 (5th Cir. 1980) (*quoting Pacific Molasses Co. v. Federal Trade Com.*, 356 F.2d 386, 389-90 (5th Cir. 1966) (emphasis added but other alterations in original).

Although she claims to not have received the report of her polygraph examination and the supplement to her administrative inquiry, Yelder has failed to articulate the prejudice that she suffered thereby. After a thorough review of the record, the court concludes that there is no evidence that Yelder was prejudiced by DoD's possible violations of its regulations in this regard. As to the polygraph examination, the Statement of Reasons that DoD issued to her indicates that in making its initial determination to revoke her security clearance the WHS CAF did not rely on the results of her polygraph examination, but only relied on statements that she was alleged to have made during the pre-polygraph examination. Yelder was fully able to, and did, respond to the WHS CAF's reliance on the alleged statements in her November 17, 1997, response to the Statement of Reasons. As to the supplement to the administrative inquiry, it is clear from the evidence that such was not relied upon by any of the entities associated with the revocation of Yelder's clearance. Based on the foregoing, then, it is clear that Yelder has failed to demonstrate prejudice; in fact, the record demonstrates the contrary.

26

### c.   WHS CAF's Reply to Yelder's Response

Finally in regard to DoD Regulation 5200.2-R, Yelder argues that she did not receive from the WHS CAF within thirty days a reply to her response to the Statement of Reasons provided to her in justification of the proposed revocation of her security clearance. The court first points out that the WHS CAF's deadline to reply to a response to a Statement of Reasons is sixty days from the date it received the response, not thirty days. *See* DoD Reg. 5200.2-R at § 8-201(c). Even so, however, it appears from the record that DoD missed its deadline by a few days. The record discloses that WHS CAF received Yelder's response on November 19, 1997. However, its reply to her response, in the form of a Letter of Revocation, is dated January 20, 1998, which is two days beyond the sixty days allowed by the regulation.

Although it appears that there is a question of fact as to whether DoD violated its regulations in this regard, the record is entirely devoid of any evidence that could support an assertion by Yelder that her case was prejudiced as a result. As stated above, this court will not remand a case to DoD for a redetermination consistent with its regulations when the plaintiff is unable to demonstrate that she was prejudiced by the violation at issue, and the assertion that remand is proper on this basis is therefore meritless.

### 4.   The Alleged Assumption

Yelder saves her most forceful argument for her contention that she was never informed of, and therefore deprived of the opportunity to address, the "real reason" that the WHS CAF found that she was uncooperative in regard to the requested mental examination. According to Yelder:

27

> The regulations of the DoD require that a *Statement of Reasons* be furnished to an employee who is subjected to an adverse security clearance determination. The reasons for the determination of WHS that Ms. Yelder was uncooperative as mental/emotional evaluation was [sic] never disclosed to Ms. Yelder as required by the governing regulations. She never had an opportunity to respond. In fact, at the very time at issue, WHS sent Ms. Yelder a letter in September, 1997, noting that she made efforts to be cooperative when she eventually agreed to use an expert designated by the agency. . . . The evidence gathered during the lawsuit established that the conclusion Yelder would not cooperate was based on an <u>assumption</u> Ms. Yelder would not submit to a medical examination. Ms. Yelder was never told about this assumption or given a chance to address the assumption.

Pla.'s Br. at 4-5. There is no dispute that one of the bases for the revocation of Yelder's security clearance is a finding that she was uncooperative with the security clearance process. Indeed, the Statement of Reasons provided to her states in part:

> Despite our efforts to accommodate you and your being made aware of the potential consequences if you failed to undergo the evaluation, you still did not follow through. Your failure to cooperate with the required security processing, after indicating that you were willing to cooperate if certain accommodations were made, has lessened your credibility and precludes this office from having sufficient information on which to base a favorable determination.

Edenfield Decl. at Ex. 15.

The point urged by Yelder is that the finding by WHS CAF of a failure to cooperate with the security clearance determination process was based on an undisclosed assumption that she would not submit in the future to a mental examination by a government-designated examiner. The entire basis upon which she rests her argument is a portion of the deposition of Susan Edenfield, deputy chief of the WHS CAF:

> Q:    If the failure to follow through on obtaining a mental health evaluation was not a fault of Miss Yelder but was due to the fact that the government did not provide an expert to conduct the investigation,

28

would you consider that to be a refusal to cooperate with the security process?

. . . .

A: Miss Yelder was given numerous opportunities to have a psychiatric evaluation. She was given an opportunity to have an evaluation by a government physician. She threw up numerous blocks to this. She was advised on several occasions, I think at least three to four occasions, that her refusal to cooperate with the evaluation would not make it possible for the WHS CAF to render a favorable decision in her case. There was a question regarding whether she had an evaluation with Fletcher Hamilton. At that point the WHS CAF went to her and requested that she notify Dr. Hamilton to forward us the evaluation with five days. Subsequent to that we received a letter from her attorney that said she was now willing to go to a government physician because the evaluation with Dr. Hamilton would cost $1,000 and takes six to eight days, but her attorney requested to know the qualifications of the doctor. **Based on the numerous obstacles that were presented, that was considered a failure to cooperate with the security process.**

Q: What is the reason the government did not provide an expert to conduct the mental evaluation pursuant to her lawyer's request?

A: Based on her past behavior during the previous ten months. I can't speak for my chief. I can only speak for myself, the educated guess was that the evaluation would not take place.

. . . .

Q: Was the assumption made that she would not submit to the evaluation by the government's doctor?

. . . .

A: Based on her demonstrated behavior, it appears that that's what I'm saying.

Edenfield Dep. at 57-61 (emphasis added).

Clearly, based on Edenfield's deposition, there is evidence that the WHS CAF made the assumption that, based on her previous actions, Yelder would not submit to an evaluation by a government examiner. However, there is a connection missing. Yelder has failed to put forward any evidence that this assumption *actually formed the basis* of the

WHS CAF's determination that she was uncooperative with the security clearance process. Indeed, Edenfield made clear in her deposition that the basis of WHS CAF's determination was Yelder's *previous* actions.  Her statement concerning the assumption was in response to a query regarding why the WHS CAF refused, after ten months of waiting, to provide an examiner to perform the mental evaluation, not to a query regarding why the WHS CAF found Yelder to be non-cooperative.  In fact, it appears that Yelder has inverted the only reasoning that the evidence here supports: the assumption that she would not submit to an examination by a government doctor appears to have been based on the determination that she had been non-cooperative with the security clearance process, not the other way around.

There is simply no evidence upon which a reasonable jury could conclude that the WHS CAF based its determination that Yelder was uncooperative with the security clearance determination process on an undisclosed assumption that she would not, in the future, submit to an examination by a government-selected examiner.  To the contrary, the only evidence in the record that speaks to this issue demonstrates that the determination that she was uncooperative with the process stems entirely from her actions leading up to said determination, as stated in the Statement of Reasons that she received from the WHS CAF.  Thus, she was appropriately apprised of the state of the revocation and the reasons therefore, and an *Accardi* claim will not lie.

### 5. Termination

All of the jobs within DSS require a security clearance. Thus, when Yelder's security clearance was revoked, DSS terminated her employment. Yelder argues that her employment could only be terminated "if it was shown that there were no nonsensitive positions within the DoD that did not require such a position." Pla.'s Br. at 9. Yelder fails to cite an applicable regulation that supports her proposition. As the Federal Circuit has held, "an employee has a right to be transferred to a nonsensitive position only if that right is manifested in statute or regulation." *Hesse v. Dep't of State*, 217 F.3d 1372, 1381 (Fed. Cir. 2000). A review of the regulations and law in this area appears to demonstrate the absence of such a rule. The court is therefore unable to find that a reasonable jury could conclude that DoD violated its regulations in this regard.

## V. Conclusion

For the foregoing reasons, the DoD's motion for summary judgment is due to be granted.[16] The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this **4 7** of February, 2002.

Edwin L. Nelson
United States District Judge

---

[16] The court points out that it did not address several of DoD's arguments in favor of summary judgment, finding in favor of DoD as it did without resort to those arguments.

31